**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CHRISTOPHER L. KREBSBACH,**<br><br>Plaintiff,<br><br>v.<br><br>**AMERGY DISPOSAL, LLC,**<br>**AMERGY WASTE SOLUTIONS, LLC, and**<br>**RICHARD PERRY,**<br><br>Defendants. | Case No. _______________<br><br>Hon. ____________________ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Christopher L. Krebsbach, by his attorneys Avanti Law Group, PLLC, states the following for his Complaint against Defendants Amergy Disposal, LLC, Amergy Waste Solutions, LLC, and Richard Perry.

## I. NATURE OF THE ACTION

1. This is an action for unpaid wages, retaliatory discharge, and breach of contract. Plaintiff Christopher L. Krebsbach worked as a sales representative for Defendants' waste-brokerage business in Michigan from May 2025 until July 9, 2026.

2. Defendants required Krebsbach to form a limited liability company as a condition of employment and paid him through that entity. Defendants issued no Form W-2, no Form 1099, and withheld no federal, state, or employment taxes from any payment to him. The written agreements Defendants prepared and asked Krebsbach to execute, however, are titled employment agreements, provide that Amergy employs him, require him to devote his full business time and best efforts to Amergy, and require him to report to a Sales Director and a

Board of Managers. The second of those agreements identifies him as an "Employee" and states that his base salary is "subject to applicable withholdings."

3. On June 29, 2026, Defendants notified Krebsbach in writing that his compensation would be reduced, effective immediately, to thirty percent of monthly paid profit, on the basis of a sales "quota" that appears in neither written agreement nor of an internal audit conducted without his participation. Four days later, Defendants paid him $3,059.40 in place of the $10,000 monthly base salary his written agreement requires. Defendants paid him the remaining balance of approximately $7,000 only after they had terminated his employment.

4. On July 9, 2026, Krebsbach complained to Defendants in writing that they had misclassified him as an independent contractor and had failed to withhold and remit employment taxes on his compensation. Defendant Perry responded within approximately twenty minutes that he would treat the complaint as a resignation and demanded that Krebsbach pay Defendants $36,000 by the end of that Friday. Defendants terminated Krebsbach's employment the same day.

5. Krebsbach brings claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219; the Michigan Payment of Wages and Fringe Benefits Act, MCL 408.471 et seq.; and Michigan common law. He also seeks a declaration that he owes Defendants no repayable "draw" and that he is bound by no non-competition or customer non-solicitation covenant.

## II. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over Counts I and II under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), because those counts arise under the Fair Labor Standards Act.

7. This Court has supplemental jurisdiction over Counts III through VI under 28 U.S.C. § 1367(a). Those counts arise from the same employment relationship, the same compensation

practices, and the same July 9, 2026 termination as Counts I and II, and therefore form part of the same case or controversy under Article III.

8. Count VI seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202. The Court's jurisdiction over Count VI rests on 28 U.S.C. § 1367(a).

9. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred here. Krebsbach performed substantially all of his work in Michigan, Defendant Perry directed that work from Amergy's office in Ada, Michigan, and the compensation decisions and the termination at issue were communicated to Krebsbach in this district.

10. Venue is proper in the Southern Division under W.D. Mich. LCivR 3.2 because Krebsbach resides in Ottawa County and the events at issue occurred in Kent and Ottawa Counties.

## III. PARTIES

11. Plaintiff Christopher L. Krebsbach is an individual residing in Coopersville, Ottawa County, Michigan. At all relevant times he was an "employee" within the meaning of 29 U.S.C. § 203(e) and MCL 408.471(c).

12. Defendant Amergy Disposal, LLC is a limited liability company that the Sales Representative Employment Agreement identifies as "a New Jersey limited liability company." It is the contracting party on both written agreements at issue.

13. Defendant Amergy Waste Solutions, LLC is, on information and belief, the entity that transmitted every compensation payment Krebsbach received, appearing on his bank records as "AMERGY WASTE SOL."

14. Defendant Richard Perry is an individual residing in Lowell, Kent County, Michigan. He signed his Amergy electronic mail as "President," supervised Krebsbach's day-to-day work, instructed Krebsbach on the per-yard rates to use in pricing accounts, informed him of the rates the haulers charged Amergy and of which haulers serviced which areas, told him what revenue and profit figures to enter for his first account, directed which haulers and which affiliated entities would service, bill, and receive payment for particular accounts, reviewed and approved each of Krebsbach's monthly invoices before payment, conducted mandatory weekly sales meetings, communicated the June 26 and June 29, 2026 compensation decisions, and responded to Krebsbach's July 9, 2026 written complaint by declaring that he would treat it as a resignation.

15. Perry is an "employer" under 29 U.S.C. § 203(d) because he acted directly and indirectly in the interest of Amergy in relation to Krebsbach and exercised operational control over Krebsbach's work and compensation. He is an "employer" under MCL 408.471(d), which includes "an individual acting directly or indirectly in the interest of an employer."

16. Defendants Amergy Disposal, LLC and Amergy Waste Solutions, LLC are, on information and belief, an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1)(A), with annual gross volume of sales made or business done of not less than $500,000. Krebsbach was also individually engaged in commerce, in that he solicited, sold, and serviced accounts located in Indiana as well as

Michigan and regularly used interstate telephone, electronic mail, and messaging systems to transact that business. At Perry's direction, Krebsbach also contacted waste haulers in New Jersey to obtain service quotes, and assisted another Amergy sales employee with accounts located in Nevada and Utah.

## IV. FACTUAL ALLEGATIONS

### *A. Krebsbach joins Amergy and is directed to form an LLC.*

17. In or about March 2025, Krebsbach learned of a sales opportunity at Amergy from another Allstate Insurance employee whom Krebsbach then managed and whom Perry had recruited to Amergy. In or about April 2025, Krebsbach contacted Perry and spoke with him several times about the position before Perry informed him that he would be offered a position with Amergy.

18. Perry instructed Krebsbach to form a limited liability company through the Michigan Department of Licensing and Regulatory Affairs, and told him that Amergy would pay his invoices to that company. Krebsbach formed Krebsbach Business Consulting, LLC.

19. Krebsbach left Allstate in or about the second week of May 2025. He began performing work for Amergy in or about mid-May 2025, including training with an Amergy sales representative and prospecting for customers using rates Perry supplied, before he executed his first written agreement with Amergy. That agreement identifies June 1, 2025 as his employment start date. Krebsbach received no compensation specifically for the work he performed before June 1, 2025. The accounts he signed during that period were included on his first invoice, which he submitted at the end of June 2025.

20. On May 21, 2025, Krebsbach executed a Sales Employment Agreement transmitted to his personal electronic mail address through DocuSign by Chad DeGroot.

21. Defendants never issued Krebsbach a Form W-2 or a Form 1099 and never provided or requested a Form W-9. Defendants withheld no federal income tax, no state income tax, and no Social Security or Medicare tax from any payment to Krebsbach. Krebsbach nevertheless reported the income, paid the tax due for 2025, and began making quarterly estimated payments to the Internal Revenue Service and the State of Michigan.

***B. Defendants controlled the manner and means of Krebsbach's work.***

22. Perry instructed Krebsbach and the other sales representatives on the per-yard rates, including rates of $3.50 and $3.75 per yard, to use in determining the cost of, and pricing, accounts for prospective customers. Those rates determined the profit calculation on which Krebsbach's commission depended.

23. The sales representatives initially chose which hauler would service an account. Beginning in April 2026, Perry directed which haulers the sales representatives could and could not use. On April 9, 2026, Perry wrote to the sales team in a group message: "Please do not send any new accounts to granger. If you have anything please send to me." On April 14, 2026, Perry wrote that "Gfl is set up to secure e Lansing," directed the sales team to "send all new account to George," a GFL Environmental contact, and specified per-yard rates for that service. On April 15, 2026, Perry instructed the sales team: "Please target granger accounts today." Thereafter, Perry instructed the sales representatives to move accounts from Granger to GFL Environmental and from GFL Environmental to Priority Waste, to stop sending new business to GFL Environmental, and to send accounts to Herrington's or the City of Grand Rapids for service.

24. Perry also directed which entity would invoice and receive payment for particular accounts and sales. On information and belief, beginning in or about late April or early May 2026, Perry directed one of Krebsbach's accounts, American Dunes, to pay ATAS Enterprises rather than Amergy. Perry also instructed the sales representatives to use Jedison LLC to set up accounts when service issues arose with GFL Environmental.

25. In or about December 2025, Krebsbach sold a refurbished baler to an Amergy customer, Magnum Coffee. On December 18, 2025, Perry sent Krebsbach, from Perry's Amergy electronic mail account, an invoice for the sale in the amount of $13,800 plus sales tax, payable not to Amergy but to Responsible Recycling Partners, LLC, and instructed Krebsbach to send the invoice to the customer. The invoice lists an address for Responsible Recycling Partners, LLC in Lowell, Michigan that, on information and belief, is Perry's residence. On or about January 1, 2026, Perry notified Krebsbach by text message that he had received the customer's payment.

26. Perry also directed another Amergy employee to upload customer contracts of an entity identified as "Disposal Connections Inc."

27. Krebsbach submitted his first invoice, at the end of June 2025, to Amergy's chief financial officer, Mark Pollack. Thereafter, Perry directed when Krebsbach's invoices were to be revised and that they be submitted to Perry. Krebsbach submitted his monthly invoices to Perry by electronic mail, and Perry reviewed and approved each invoice before Defendants would pay it.

28. Defendants required attendance at weekly Monday conference calls and scheduled recurring team meetings. After Amergy obtained an office in Ada, Michigan, Perry required the sales representatives to work from that office on Mondays and Wednesdays. Perry organized a

team off-road and hog-hunting outing on the morning of May 7, 2026, followed by a team lunch , directed Krebsbach to attend a multi-hour site visit to the Kent County Landfill and Recycling Center during normal working hours on May 27, 2026, and scheduled an all-day team event on June 2, 2026 during normal working hours.

29. Defendants assigned Krebsbach non-sales duties, including training interns, accompanying interns to appointments, entering container sizes and service frequencies into a company spreadsheet at management's direction, reconciling hauler billing discrepancies, pursuing service credits from GFL, and resolving service failures on accounts already sold. On multiple occasions Krebsbach personally collected and transported customer refuse in his own vehicle because of container service problems on accounts he had sold.

30. In or about October 2025, after Krebsbach closed a large account, Perry told him that he could "go into account management mode."

31. Krebsbach regularly worked more than forty hours in a workweek. He routinely began work before 6:00 a.m. and continued past 6:00 p.m., traveled throughout Michigan including to Gaylord, Bay City, Saginaw, Flint, Detroit, and Ypsilanti, answered electronic mail, telephone calls, and messages in the early morning and late evening, performed work on Saturdays, and on multiple occasions responded on Sundays to work requests and work-related questions from Perry. Krebsbach estimates that, on average, he worked approximately forty-five hours per week.

32. Defendants did not require Krebsbach to record his hours, did not maintain any record of the hours he worked, and did not pay him any premium for hours worked in excess of forty in a workweek.

***C. The compensation terms and the retroactive "draw."***

33. Krebsbach was paid $10,000 per month. Between July 2, 2025 and June 3, 2026, twelve consecutive monthly payments from a payor identified as "AMERGY WASTE SOL" were deposited by automated clearing house into the account of Krebsbach's limited liability company. Ten of those payments were $10,000. The payments deposited on January 6, 2026 and February 3, 2026 were $10,012 and $10,090.

34. In or about January 2026, Defendants informed Krebsbach for the first time that a portion of the compensation already paid to him was a repayable "draw" or "overpayment," and that he owed Amergy $36,428. That figure was calculated from an internal review of prior invoices and billing conducted without Krebsbach's participation. Defendants did not furnish him any accounting supporting the figure at that time.

35. On January 29, 2026, DeGroot executed a Sales Representative Employment Agreement on behalf of Amergy Disposal, LLC (the "2026 Agreement"). Krebsbach executed the 2026 Agreement through DocuSign on February 2, 2026. Section 1.1 provides that "[t]he Company hereby employs Employee, and Employee accepts employment with the Company." Section 2.2 requires Krebsbach to "report to the Sales Director and the Company's Board of Managers" and to "devote full business time, attention, and best efforts to the business and affairs of the Company."

36. Section 3.1 of the 2026 Agreement provides: "During the 1 Year Term, Employee's base salary shall be $10,000 per month, payable in regular monthly installments in accordance with the Company's payroll practices and subject to applicable withholdings." The same section conditions commission eligibility on repayment of $36,428.

37. Section 3.2 provides that, once the $36,428 is repaid, Krebsbach "shall be eligible to receive commission compensation equal to thirty percent (30%) of contracted sales profit generated from accounts sourced, developed, and/or closed by Employee during the 1 Year Term," with "contracted sales profit" defined as gross profit "as calculated by the Company" and "recorded in the Company's internal accounting and reporting systems."

38. The 2026 Agreement contains no sales quota. It contains no non-competition covenant. It contains no customer non-solicitation covenant. It contains no arbitration clause. Section 8.1 states that the agreement "constitutes the complete agreement between the parties regarding Employee's employment during the 1 Year Term and supersedes all prior or contemporaneous understandings."

***D. The billing discrepancies and the instruction not to correct the invoices.***

39. In or about late January and early February 2026, Krebsbach and other sales employees reviewed their account invoices and identified significant discrepancies between the rates that should have been charged and the amounts a hauler, GFL, was actually charging.

40. Krebsbach and at least one other employee asked management whether they should correct their invoices. Perry instructed them not to do so, stating that the invoices would be used to request credits from the hauler and that the company wanted to track what it should have been charged.

41. Because commission under the 2026 Agreement is calculated on "contracted sales profit" derived from the Company's own invoices and internal accounting records, the uncorrected invoices reduced the profit figures attributed to Krebsbach's accounts.

42. On or about June 29, 2026, Krebsbach identified in writing nineteen accounts that he contends were being charged incorrectly.

***E. The June 2026 emails and the unilateral change in compensation.***

43. On June 26, 2026, Perry sent Krebsbach an electronic mail message stating that half of the accounts on Krebsbach's invoice were incorrect, that making sure the invoice was correct was Krebsbach's responsibility, and that if Krebsbach "were working at WM" he "would be fired for embezzlement." The message also stated that Krebsbach owed "$36,000" and had "not paid any of it back." The message was the first written communication in which the word "quota" was directed to Krebsbach.

44. Krebsbach telephoned Perry the same day. Perry stated, in substance, that he was only trying to get a rise out of Krebsbach and that the matter would be discussed the following Monday.

45. On June 29, 2026, Perry sent Krebsbach an electronic mail message stating that Krebsbach had $13,980 in HubSpot, that his monthly quota was $5,000, that his year-to-date quota was $30,000, that he had repaid only $11,309 of the prior year's draw, and that on the basis of those figures his compensation plan would be adjusted to thirty percent of paid profit monthly. A table in the message restated Krebsbach's profit for March, April, and May 2026 under the heading "Actual profit after audit 6/27," reducing the figure for each of those three months to $10,198. The same table listed the $10,000 monthly payments for January through May 2026 under the heading "2026 Payroll."

46. Neither written agreement establishes any sales quota, any year-to-date quota, or any six-month repayment schedule. Before June 26, 2026, Defendants had never communicated

a quota to Krebsbach in writing, had never placed him on a performance improvement plan, and had never issued him any written performance warning.

47. Krebsbach responded the same evening in writing. He objected that the announced change did not conform to his employment agreement, denied that any repayment deadline had been agreed, and identified the accounts he contended were being billed incorrectly.

48. On or about June 30, 2026, Perry told Krebsbach by telephone that Krebsbach would not be paid the $10,000 and stated, in substance, that because Krebsbach was a "1099" worker, his employment agreement did not matter. On July 1, 2026, Perry told Krebsbach that his written objection was "a list of excuses."

49. On July 1, 2026, Krebsbach also told Perry that the Magnum Coffee baler sale, for which the customer paid in 2026, should be credited to his sales in HubSpot. On information and belief, that sale was not included in the HubSpot figure stated in Perry's June 29, 2026 message. Perry responded that he had instead chosen to pay Krebsbach directly for that sale, and described having done so as a "favor." Krebsbach had received $2,000 for the sale by a check dated January 7, 2026, drawn on an account of Responsible Recycling Partners, LLC.

50. On July 3, 2026, Defendants paid Krebsbach $3,059.40 rather than the $10,000 monthly base salary required by Section 3.1.

***F. Krebsbach complains of misclassification and is terminated the same day.***

51. On July 9, 2026, Krebsbach sent Defendants an electronic mail message raising Defendants' treatment of him as an independent contractor and Defendants' failure to withhold and remit employment taxes.

52. Perry responded to Krebsbach's July 9, 2026 message within approximately twenty minutes, copying DeGroot and Pollack. Perry's response stated that he would accept the message as Krebsbach's resignation, directed Krebsbach to Section 4.1 of the agreement, asserted that Krebsbach was a "1099 subcontractor" and "not an employee of Amergy," stated that Amergy was "paying your LLC," and demanded payment of $36,000 by Friday.

53. On July 9, 2026, after Perry's response, Defendants removed Krebsbach's access to his Amergy electronic mail account.

54. Krebsbach replied the same day stating that he had not resigned.

55. Later on July 9, 2026, DeGroot and another Amergy representative, Hudi Strickman, telephoned Krebsbach and terminated his employment. During the call, DeGroot told Krebsbach that he would receive the rest of his pay and that July 9, 2026 would be his last day of employment with Amergy Disposal. Krebsbach did not resign.

56. Krebsbach was terminated less than one day after his written complaint of misclassification.

57. Shortly after the July 9, 2026 call, Defendants wired Krebsbach approximately $7,000. Together with the payment of $3,059.40 made on or about July 3, 2026, that payment brought Krebsbach's compensation for July 2026 to the $10,000 monthly base salary required by Section 3.1.

***G. Defendants' assertion of covenants that do not exist.***

58. By letter dated July 8, 2026, and again by certified mail on or about July 14, 2026, Amergy Disposal advised Krebsbach of its "intent to pursue" claims for tortious interference and stated that it "will pursue collections for the total amount of Revenue and Profits for any account

who changes over to you or any entity you are a part of for the remaining months of the agreement."

59. The July 8, 2026 letter further states that the obligations it describes "are independent of, and in addition to, the confidentiality, non-solicitation, and any other post-employment obligations contained in this Agreement."

60. The 2026 Agreement contains no non-solicitation obligation. Sections 5 and 6 impose confidentiality, return-of-property, and work-product assignment obligations only.

61. An actual and justiciable controversy therefore exists between the parties concerning (a) whether Krebsbach owes Defendants the $36,428 described as a repayable draw, and (b) whether Krebsbach is subject to any non-competition or customer non-solicitation covenant.

## V. CLAIMS FOR RELIEF

### COUNT I — FAILURE TO PAY OVERTIME
### Fair Labor Standards Act, 29 U.S.C. §§ 207, 216(b) — All Defendants

62. Krebsbach realleges and incorporates each preceding paragraph.

63. The Fair Labor Standards Act requires an employer to pay each employee not less than one and one-half times the employee's regular rate for all hours worked in excess of forty in a workweek, 29 U.S.C. § 207(a)(1).

64. At all relevant times Krebsbach was an employee of Defendants within the meaning of 29 U.S.C. § 203(e), and Defendants were his employers within the meaning of 29 U.S.C. § 203(d). Defendants' designation of Krebsbach as an independent contractor does not control; the economic reality of the relationship does.

65. The economic reality of the relationship establishes employment. Defendants drafted and required Krebsbach to execute employment agreements, the second of which designates him an "Employee"; required him to devote his "full business time, attention, and best efforts" to Amergy; required him to report to a Sales Director and a Board of Managers; instructed him on the per-yard rates to use in pricing accounts; directed which haulers and affiliated entities would service, bill, and receive payment for his accounts; required him to work from Amergy's office on designated days; reviewed and approved his invoices before payment; required attendance at recurring mandatory meetings; assigned him non-sales duties including intern training and data entry; and paid him a fixed monthly amount that did not vary with profit or loss, which Perry's June 29, 2026 table listed as "Payroll."

66. Krebsbach regularly worked more than forty hours in a workweek and received no premium compensation for those hours.

67. Defendants failed to make, keep, and preserve records of the hours Krebsbach worked, as 29 U.S.C. § 211(c) and 29 C.F.R. Part 516 require. Krebsbach is therefore entitled to prove the amount and extent of his uncompensated work by just and reasonable inference.

68. Defendants' violations were willful within the meaning of 29 U.S.C. § 255(a). Defendants prepared an agreement designating Krebsbach an "Employee" and providing that his salary was "subject to applicable withholdings," then treated him as a contractor for tax and wage purposes, issued no tax forms of any kind, and, when Krebsbach objected in writing, Perry told him that his employment agreement did not matter.

69. Krebsbach is entitled to unpaid overtime compensation, an additional equal amount as liquidated damages, reasonable attorney fees, and costs under 29 U.S.C. § 216(b).

## COUNT II — RETALIATION
## Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) — All Defendants

70. Krebsbach realleges and incorporates each preceding paragraph.

71. It is unlawful for any person to discharge or in any other manner discriminate against an employee because the employee has filed any complaint or instituted any proceeding under or related to the Fair Labor Standards Act. 29 U.S.C. § 215(a)(3).

72. The exemptions in 29 U.S.C. § 213(a) apply by their terms only to sections 206 and 207. They do not limit the protection of section 215(a)(3).

73. On June 29, 2026, Krebsbach complained to Defendants in writing that the announced reduction in his compensation did not conform to his employment agreement. On June 30, 2026, he complained again by telephone. On July 9, 2026, he complained in writing that Defendants had misclassified him as an independent contractor and had failed to withhold and remit employment taxes on his wages.

74. Those complaints were sufficiently clear and detailed that a reasonable employer would understand them as assertions of rights protected by the Fair Labor Standards Act, including Krebsbach's assertion that he was an employee rather than an independent contractor.

75. Defendants discharged Krebsbach on July 9, 2026, within hours of his written complaint of misclassification.

76. Krebsbach is entitled to the legal and equitable relief available under 29 U.S.C. § 216(b), including reinstatement or front pay, lost wages, an additional equal amount as liquidated damages, reasonable attorney fees, and costs.

**COUNT III — BREACH OF CONTRACT**
**Against Amergy Disposal, LLC and Amergy Waste Solutions, LLC**

77. Krebsbach realleges and incorporates each preceding paragraph.

78. The Sales Representative Employment Agreement executed January 29, 2026 is a valid and enforceable contract.

79. Section 3.1 obligates Amergy to pay Krebsbach a base salary of $10,000 per month during the one-year term. That obligation is stated without condition and is not tied to any quota, profit threshold, or repayment schedule.

80. Krebsbach performed his obligations under the agreement, or his performance was excused.

81. Amergy breached Section 3.1 on or about July 3, 2026 by paying $3,059.40 in place of the $10,000 monthly base salary then due, and paid the balance only after it had terminated Krebsbach's employment.

82. Amergy further breached the agreement by unilaterally purporting to replace the base salary with a commission-only arrangement, without the written amendment signed by both parties that Section 8.2 requires.

83. Section 4.3 entitles Krebsbach, upon termination without Cause, to base salary through the effective date of termination, commissions earned and due through that date, and reimbursement of approved business expenses. Defendants have not paid the commissions earned and due through that date and have not reimbursed approved business expenses.

84. Krebsbach was not terminated for Cause as Section 4.5 defines that term, and, on information and belief, the Board made no good-faith determination that Cause existed.

85. Krebsbach has been damaged in an amount to be proven at trial, including commissions earned and due and unreimbursed approved business expenses.

**COUNT IV — FAILURE TO PAY WAGES**
**Michigan Payment of Wages and Fringe Benefits Act, MCL 408.471 et seq. — All Defendants**

86. Krebsbach realleges and incorporates each preceding paragraph.

87. "Wages" under the Act means "all earnings of an employee whether determined on the basis of time, task, piece, commission, or other method of calculation for labor or services," excluding fringe benefits. MCL 408.471(f). Commissions are therefore wages.

88. "Employer" under the Act includes "an individual acting directly or indirectly in the interest of an employer who employs 1 or more individuals." MCL 408.471(d).

89. Defendants failed to pay Krebsbach wages earned, including commissions earned on accounts he sourced, developed, or closed.

90. Krebsbach is entitled to the unpaid wages together with the relief the Act affords.

**COUNT V — UNJUST ENRICHMENT**
**Pleaded in the Alternative — All Defendants**

91. Krebsbach realleges and incorporates each preceding paragraph.

92. This Count is pleaded in the alternative to Counts III and IV, in the event the written agreements are held unenforceable or inapplicable to the compensation at issue.

93. Krebsbach conferred a benefit on Defendants by sourcing, developing, and closing customer accounts, the majority of which carry sixty-month terms, and by servicing those accounts after sale.

94. Defendants accepted and retained that benefit, and continue to receive revenue from the accounts Krebsbach generated.

95. Defendants' retention of that benefit without paying Krebsbach the compensation he earned is inequitable.

96. Krebsbach is entitled to the reasonable value of the services he rendered.

**COUNT VI — DECLARATORY JUDGMENT**
**28 U.S.C. §§ 2201–2202 — Against Amergy Disposal, LLC and Amergy Waste Solutions, LLC**

97. Krebsbach realleges and incorporates each preceding paragraph.

98. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

99. Defendants assert that Krebsbach owes them $36,428 as a repayable draw. Krebsbach disputes that any such obligation is owed, disputes the accounting on which the figure rests, and states that the figure was calculated without his participation. The only accounting Defendants have furnished to him is the summary table in Perry's June 29, 2026 message, which reports $11,309 as repaid three days after Perry's June 26, 2026 message stated that Krebsbach had "not paid any of it back."

100. Defendants assert in their July 8, 2026 letter that Krebsbach is subject to "non-solicitation" and "other post-employment obligations contained in this Agreement." The

2026 Agreement contains no non-competition covenant and no customer non-solicitation covenant.

101. Krebsbach seeks a declaration that (a) he owes Defendants no repayable draw or loan in the amount of $36,428 or any other amount, and (b) he is subject to no non-competition covenant and no customer non-solicitation covenant arising from his employment with Defendants.

102. Krebsbach does not by this Count seek any declaration concerning his obligations under Sections 5 and 6 of the 2026 Agreement, which remain in force according to their terms.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Christopher L. Krebsbach respectfully requests that this Court:

A. Award unpaid overtime compensation under 29 U.S.C. § 207, together with an additional equal amount as liquidated damages under 29 U.S.C. § 216(b);

B. Award all legal and equitable relief available for retaliation under 29 U.S.C. §§ 215(a)(3) and 216(b), including reinstatement or front pay in lieu of reinstatement, lost wages and benefits, and liquidated damages;

C. Award damages for breach of contract in an amount to be proven at trial;

D. Award unpaid wages and the relief available under MCL 408.471 et seq.;

E. In the alternative, award the reasonable value of the services Krebsbach rendered;

F. Declare that Krebsbach owes Defendants no repayable draw or loan, and that he is subject to no non-competition or customer non-solicitation covenant;

G. Award reasonable attorney fees and costs under 29 U.S.C. § 216(b) and as otherwise allowed by law;

H. Award pre-judgment and post-judgment interest as allowed by law; and

I. Grant such other and further relief as the Court deems just.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

Respectfully submitted,

**AVANTI LAW GROUP, PLLC**

*/s/ Robert Anthony Alvarez Sr.*
Robert Anthony Alvarez Sr. (P66954)
Avanti Law Group, PLLC
Attorney for Plaintiff

Dated: November 2, 2026

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.

Date: 10-29-2026

Christopher L Krebsbach

/s/

Christopher Krebsbach

# CONSENT TO SUE

I hereby give my consent to file suit on my behalf under the Fair Labor Standards Act or any other state or federal laws. I hereby authorize my attorneys, Avanti Law Group, PLLC, to represent me in any Court or Agency.

In the event that I can not be reached despite reasonable efforts to contact me, I further authorize Avanti Law Group PLLC to engage in settlement negotiations and, if in their professional judgment it is in my best interest, to resolve my claims on reasonable terms consistent with the facts of my case and applicable law.

Fecha/Date: 2026-10-29

Christopher Krebsbach

Signature

Christopher Krebsbach

Printed Name